NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

TRUCKDRIVERS, CHAUFFEURS AND
HELPERS, LOCAL UNION NO. 100,
INTERNATIONAL BROTHERHOOD
OF TEAMSTERS, CHAUFFEURS,
WAREHOUSEMEN AND HELPERS
OF AMERICA, Respondent.

No. 75–1659.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 14, 1975.

Decided March 24, 1976.

Rehearing Denied May 7, 1976.

Elliott Moore, Paul J. Spielberg, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D. C., for petitioner.

Paul H. Tobias, Goldman, Cole & Putnick, Cincinnati, Ohio, for intervenor.

Jonas B. Katz, Gettler & Katz, Cincinnati, Ohio, for respondent.

Before PECK, Circuit Judge, MARKEY, Chief Judge, United States Court of Customs and Patent Appeals,* and ENGEL, Circuit Judge.

PECK, Circuit Judge.

This case is before the court upon application of the National Labor Relations Board for enforcement of its order issued against Truckdrivers, Chauffeurs and Helpers, Local Union No. 100, International Brotherhood of Teamsters [Union].

Duro Paper Bag Manufacturing Company [Company], the charging party, does most of its own carrier work and employs approximately twenty drivers. The Union has represented the Company's drivers for the past ten years and prior to the 1973

* Sitting by designation.

negotiations the Company had signed both the Teamsters Master Agreement, which expired June 30, 1973, and an addendum, which expired in about October 1973, covering local working conditions.

On March 28, 1973, the Company notified the Union that it intended to bargain with the Union on its own behalf for an entire collective bargaining agreement. The Company and the Union held negotiating meetings on November 17, November 29, and December 7, 1973. The Company was represented by Employee Relations Director Rains, and the Union by Business Agent Jack O'Banion and three members of a negotiating committee. At the first meeting Rains indicated that he had authority to consummate an agreement and in response to Rains' question as to whether O'Banion had the same authority, O'Banion replied, "Let's go on," and the parties then exchanged proposals. By the third meeting, the parties had resolved their differences as to all but two major contract provisions, the grievance procedure and wages. The dispute regarding the grievance procedure revolved around the Company's proposal that the Federal Mediation and Conciliation Service be the source of arbitrators. Rains proposed instead that each party draw up its own list of arbitrators and according to Rains' testimony (which the administrative law judge and the Board credited), the Union was agreeable to that, and proceeded to a discussion of wages.

On the issue of wages, the Union had proposed substantial increases for pickups and deliveries, which proposal the Company had rejected. Alternatively, the Union suggested that the drivers be paid on an hourly rate for such work. After protracted discussion, Rains hit the table, stood up and said, "You got it." Then, according to Rains' credited testimony, Rains advised the Union negotiators that the agreement would be typed and sent to them the following day. He then shook hands with the four men and left. Business Agent O'Banion agreed generally with Rains' testimony as to the December 7th meeting. However, O'Banion testified that the three committee-

teemen would not accept the grievance procedure and therefore, would not recommend it to the other drivers.

On December 8, Rains had the agreement typed and that evening he telephoned O'Banion to secure final agreement as to five items upon which there was understanding, but which required the technical language to be cleared by the Company's attorney. These items were: (1) a driver protection clause; (2) a list of management representatives, upon whom a driver could call regarding problems with work; (3) transfer of title clause, protecting the Union in the event of a sale of the Company; (4) a cost of living clause; and (5) a list of management suggested arbitrators. These items were agreed to by O'Banion.

Within the next few days, Rains submitted the written agreement to the Union, but he never received it back and was unable to reach O'Banion by phone in order to determine what had happened. On or about December 15, the Union had a meeting and, by secret ballot, unanimously voted down the Company's proposal. On December 29, Rains was told the Job Steward had notified the Company not to put the new rates into effect or there would be trouble. On March 23, 1974, O'Banion advised Rains that the Union would not accept the contract and urged the Company representative to sign the Teamsters Master Freight Agreement, which Rains refused to do. On March 30, 1974, the parties met and the Company maintained it had a binding contract but wished to resolve any difference which endangered the employer-employee relationship. No resolution was forthcoming.

The Union's position has been and is that: (1) there was never an agreement reached between the parties; and (2) even if such agreement was reached, a condition precedent to the consummation of such agreement was ratification by the membership, and the Company was at all times aware of such condition precedent. The administrative law judge found and the Board adopted the finding, "that the members of the Union's negotiating committee, on and after

December 7, 1973, concluded that they had negotiated a binding agreement with the Company even though they may have felt that they should submit any agreement they negotiated to the membership for approval." The administrative law judge further found that neither past practice nor the International Union's constitution was sufficient to put the Company on notice that ratification by the membership was a condition precedent to conclusion of a binding collective bargaining agreement. The administrative law judge rejected, in light of all circumstances including demeanor considerations, testimony of the three Union committeemen that Rains was told of the necessity for member ratification. Instead, he found that the actions of the Union representatives were such as to lead Rains to believe they had authority to negotiate to a final agreement.

In light of the above findings, the Board concluded that by refusing to execute the collective bargaining agreement with the Company, the Union engaged in unfair labor practices within the meaning of the National Labor Relations Act § 8(b)(3), and ordered the Union to cease and desist from these unfair labor practices and if requested to do so by the Company, to sign the proposed agreement.

■ Section 8(b)(3) of the National Labor Relations Act provides that: "It shall be an unfair labor practice for a labor organization or its agents . . . to refuse to bargain collectively with an employer . . . ." This court has held that this provision requires that when the parties reach an agreement they have a duty to execute a written contract. *Standard Oil Co. v. N.L.R.B.*, 322 F.2d 40, 45 (6th Cir. 1963). Whether or not an agreement has been reached between the parties is a question of fact for the Board to determine, and we "are charged by statute and case law, . . . to uphold factual findings of the Board which are supported by substantial evidence on the record viewed as a whole." *Adams Potato Chips, Inc. v. N.L.R.B.*, 430 F.2d 90, 94 (6th Cir. 1970), *cert. denied*, 401 U.S. 975, 91 S.Ct. 1194, 28 L.Ed.2d 324 (1971); *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

■ Although the testimony of the key witnesses for the parties in this case conflicts in several respects, there is clearly substantial evidence in the record viewed as a whole from which the Board could conclude that an agreement was reached. The administrative law judge and the Board chose to credit the testimony of the Company's witness, Rains, and the "credibility of witnesses is within the 'special province' of the Board, which not only has experience and expertise in labor disputes, but also has the benefit of the [administrative law judge's] observations as to demeanor evidence." *Adams Potato Chips, Inc. v. N.L.R.B., supra* at 94. Furthermore, in determining whether the parties have in fact reached agreement under a particular set of circumstances, the Board is not strictly bound by the technical rules of contract law. *Lozano Enterprises v. N.L.R.B.*, 327 F.2d 814, 818 (9th Cir. 1964).

■ As to the Union's contention that ratification by its membership was a condition precedent to conclusion of an agreement, while a Union's membership may require ratification by the membership, *Houchens Market v. N.L.R.B.*, 375 F.2d 208, 212 (6th Cir. 1967), an employer may rely upon the apparent authority of the Union representatives to conclude an agreement, where there is a basis for such reliance. *International Union of Elevator Constructors, Local No. 8*, AFL–CIO, 185 N.L.R.B. 769 (1970), *enforced* 465 F.2d 974 (9th Cir. 1972). There is substantial evidence in the record of the instant case from which the Board could conclude that the employer reasonably relied upon the representations of the Union negotiators that they had the authority to bargain to final agreement.

We conclude that substantial evidence supports the Board's findings that there was an agreement reached between the parties and that the Union acted in violation of the National Labor Relations Act, § 8(b)(3) in refusing to execute that agreement.

Enforcement of the Board's order is granted.