### NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

### ROLL & HOLD DIVISION AREA TRANSPORTATION COMPANY, INCORPORATED, Respondent.

#### No. 90–3760.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 31, 1991.

Decided Feb. 20, 1992.

Magdalena Revuelta (argued), N.L.R.B., Contempt Litigation Branch, Washington, D.C., Elizabeth Kinney, N.L.R.B., Region 13, Chicago, Ill., Aileen A. Armstrong, Howard E. Perlstein, N.L.R.B., Appellate Court, Enforcement Litigation, Washington, D.C., for petitioner.

Leonard R. Kofkin (argued), Fagel & Haber, Chicago, Ill., for respondent.

Before BAUER, Chief Judge, COFFEY, Circuit Judge, and WISDOM, Senior Circuit Judge.[1]

WISDOM, Senior Circuit Judge.

In this case we are asked to enforce an order of the National Labor Relations Board ("the Board") requiring Roll & Hold Division, Area Transportation Co., Inc. ("the company"), among other things, to execute and carry out a written collective bargaining agreement with the United Steel Workers of America, AFL–CIO ("the Union"). The company argues that the Board erroneously held that the company and the Union reached a final agreement

---

1. The Honorable John Minor Wisdom, Senior Judge of the United States Court of Appeals for the Fifth Circuit, is sitting by designation.

that was binding on the parties. Because we find that there is substantial evidence in the record to support the Board's decision, we grant the application for enforcement.

## I. BACKGROUND

The Union was certified to represent the company's warehouse employees on November 30, 1987. The company and the Union began negotiating a collective bargaining agreement in March 1988. The members of the Union's negotiating team were Luther Jenkins, who is a Union staff member, and various warehouse employees of the company. The members of the company's team were Leonard Kofkin, who is in-house counsel for the company, and various supervisory employees of the company.

By June 1988 the parties had come to a complete accord on what they termed "non-economic issues". Thereafter the parties turned to economic matters. The company steadfastly refused to acquiesce in any wage increases. The company rejected both a plan calling for a one-year wage freeze with a wage reopener in the second year and a plan calling for a two-year freeze with a reopener in the third year.

On October 14, 1988, the Union negotiators decided that they would accept the company's proposal as it stood on that day. The Union negotiators told the company's negotiators that the Union accepted the company's proposals, and the parties shook hands across the table.

On October 15, Mr. Jenkins presented the proposal to the employees. The fourteen employees present[2] voted unanimously to ratify the agreement. On October 16, Mr. Jenkins called Mr. Kofkin to tell him the agreement had been ratified and to ask Mr. Kofkin to draft the document and prepare it to be signed. On October 17, a couple of employees apparently complained to a member of the negotiating team concerning the ratification process. Also on October 17, the company distributed a memorandum to its employees explaining what the Union had bargained away (wage increases, merit increases, profit sharing plan, etc.). On October 20, the company distributed a second memorandum informing the employees that if the agreement had not, in fact, been ratified by a majority, then it was up to the employees to complain to the Union.

In November 1988, Mr. Kofkin sent copies of the agreement to Mr. Jenkins and asked that the copies be returned to him after the International Union had signed it. Mr. Jenkins called Mr. Kofkin in early December concerning the fact that there was no specific mention of the medical plan in the agreement. Mr. Jenkins also told Mr. Kofkin that the parties would sit down together and sign the agreement.

All the while, the company had apparently been receiving information that certain employees were dissatisfied with the agreement.[3] On December 14, 1988, the employees were called to a meeting by the company. The purpose of this meeting was to conduct a poll of the employees' feelings about the Union and the agreement. Sixteen of the twenty employees present voted that "The union does not represent me and I do not want the company to agree to the terms of the three-year contract".[4]

In late December 1988 or early January 1989, Mr. Jenkins called Mr. Kofkin about the agreement. Mr. Kofkin responded that the company had decided not to go through with the agreement.

The Union filed a grievance against the company with the Board. The Union alleged that the company had violated provisions of the National Labor Relations Act[5]

---

**2.** There were approximately twenty employees in the bargaining unit.

**3.** One witness testified that approximately one-half of the employees were upset either with the agreement itself (specifically, the lack of a wage increase) or with the ratification procedure.

**4.** Between November 30, 1987, when the Union was certified, and December 14, 1988, when this poll was conducted, the company's workforce had changed dramatically. Only nine of the twenty-three employees who had originally voted in the certification election were still employed by the company when this poll was taken.

**5.** 29 U.S.C. § 151 *et seq.*

by failing and refusing to execute the written contract embodying the terms of the agreement reached between the parties on October 14, 1988, by polling its employees to determine whether the employees wanted the Union to represent them and whether they wanted the company to execute the agreement, and by withdrawing recognition from and refusing to bargain with the Union.

Based on the foregoing facts the administrative law judge (the "ALJ") found that the parties had reached a final agreement on October 14, 1988. Both parties appealed this decision to the Board. The Board upheld the decision of the ALJ with only minor modifications. The Board found that the parties had reached a full and final agreement on October 14, 1988, and that there were no conditions precedent to the formation of a contract. Since a union enjoys an irrebuttable presumption of majority status during the term of a collective bargaining agreement,[6] the Board also affirmed the ALJ's decision that the company had violated the NLRA by polling its employees.

## II. DISCUSSION

■ This Court must uphold the finding of the Board that a binding agreement existed as long as that finding is supported by substantial evidence on the record considered as a whole.[7] The company has two basic lines of argument in opposition to the Board's order. First, the company argues that Board erred in finding that there were no unfulfilled conditions precedent to the company's execution of the agreement. Second, the company argues that the Board erred in finding that the parties had reached a final and binding agreement.

6. *See, e.g., Bellwood General Hospital, Inc. v. NLRB,* 627 F.2d 98, 102 (7th Cir.1980).

7. 29 U.S.C. § 160(e) ("The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive").

8. For an excellent discussion of the Board's decisions in this area see Chairman Stephen's concurring opinion in *Sierra Publishing Co. d/b/a*

## A. *Conditions precedent.*

### 1. Ratification by the employees.

■ After the parties shook hands across the table, Mr. Jenkins told the company's negotiation team that he was going to have the agreement ratified by the employees. The company argues that this is proof that ratification by the employees was a condition precedent.

The company provides no evidence that the parties at any time agreed that ratification was *necessary* to the contract. Some unions do have internal bylaws that require all agreements to be ratified. Occasionally, the union and the company do agree that ratification is a condition precedent. Nevertheless, the Board has consistently held that unless specifically agreed to, ratification is not a condition precedent to the contract coming into being.[8]

The only time that ratification was mentioned was after the agreement had been reached. The fact that Mr. Jenkins volunteered to have the agreement ratified by the employees does not show that the parties agreed that ratification was a necessary condition precedent. The Board was fully justified in finding that it was not such a condition.[9]

### 2. Execution by the International Union.

■ The company also argues that execution by the International Union was a condition precedent to the company's obligation to execute the agreement. The company points to no evidence indicating that the parties agreed to such a requirement. Instead, the company relies on isolated statements that were made after the agreement had been reached.

*The Sacramento Union,* 296 NLRB No. 65 (September 5, 1989).

9. Even if it had been a condition, Mr. Jenkins reported that the fourteen employees present at the meeting unanimously ratified the agreement. Further, Warren Fryer, a company employee, testified that all fourteen employees present at the meeting had voted to accept the agreement. This evidence was not rebutted.

The company contends that Mr. Jenkins's request that Mr. Kofkin put ten signature lines on the contract created a condition precedent. Mr. Jenkins did ask for ten lines for the International Union's signatures. The company also makes much of the fact that Mr. Kofkin, the company's in-house counsel, sent the contract to Mr. Jenkins "for the Union's signatures". The company states that Mr. Jenkins's failure to object to the procedure suggested by Mr. Kofkin until four or five weeks later indicates that there had been a prior agreement that the International Union's signatures were a condition precedent.

What is most obvious is the lack of evidence regarding this alleged condition precedent. The company never even implies that the parties agreed to any conditions during the course of negotiations. A thorough reading of the record shows that the Board was fully justified in finding that there were no conditions precedent.[10]

B. *Substantial evidence to support the NLRB's decision that the parties had reached a final and binding agreement.*

1. The word "tentative".

■ The company argues that the ALJ and the Board selectively ignored portions of Mr. Jenkins' testimony. The portions the company contends were ignored are the six times that Mr. Jenkins referred to the agreement as "tentative". The company attempts to take this one word and build an entire case around it. The company's position is that the agreement obviously was not final if the Union's chief negotiator referred to it as tentative.

The evidence, however, indicates that Mr. Jenkins termed the agreement tentative because it had not been executed, not because the parties had failed to reach an agreement. The company even admitted that the agreement was final. In its October 17, 1988, letter to its employees, the company stated: "We are obliged by law to put the agreement into a written contract and will do so." Of the five witnesses who testified before the ALJ, four said that an agreement had been reached. Glen Becker, a member of the company's negotiating team, testified that the Union and the company reached an agreement.[11] Three members of the Union's negotiating team, Warren Fryer, Terry Edwards, and Mr. Jenkins, testified that the parties had reached an agreement when they shook hands across the table on October 14, 1988.[12] Even the one witness who did not squarely testify that there was a final agreement, Kent Robbins, testified that there was a handshake agreement.[13] All of this is sufficient evidence from which the Board could determine that the parties had reached a full and final agreement.[14]

2. The health plan.

■ The company's other argument is that Mr. Jenkins later asked Mr. Kofkin to include additional matters in the agreement. Their argument is basically that an attempt to modify indicates that there was no final agreement. Mr. Jenkins's testimony, and the position of the Union, is that Mr. Jenkins was merely asking for an explicit reference to the Health Plan that had already been agreed upon. This was also the finding of the ALJ. The company argues that instead, Mr. Jenkins was asking

---

10. The company argues that the Board relies on appeal on rationales not apparent in the Board's order or in the ALJ's decision. Given the lack of testimony or other evidence tending to show that the parties had agreed to any conditions precedent, the Board's summary treatment of the issue ("we find that the record does not demonstrate that there were any conditions precedent") was quite sufficient.

11. Transcript of Proceedings, Case No. 13–CA–28292, (June 5–7, 1989), at 46, 49, and 363 [hereinafter, "Tr. at ___"].

12. Tr. at 106, 186, 227–29, and 258.

13. Tr. at 380.

14. It is true that neither the ALJ nor the Board addressed the use of the word "tentative". Given the overwhelming weight of the evidence that the parties had indeed reached a final agreement, it is understandable that the Board and the ALJ felt no need to explain the use of the word "tentative" six times by one witness in three days of testimony from five witnesses.

for Sickness and Accident benefits, which had not been agreed upon.[15]

The ALJ and the Board chose to credit the testimony of Mr. Jenkins that all he was seeking was an explicit reference to the Health Plan.[16] There was no evidence to indicate that he was seeking a modification or that there was any confusion regarding what benefits were to be provided.

### III. CONCLUSION

There is substantial evidence that the parties reached a full and final agreement on October 14, 1988. The Board was fully justified in finding that there were no conditions precedent to the contract coming into existence.

For these reasons, the Board's APPLICATION FOR ENFORCEMENT is GRANTED.

---

**15.** The company already provided certain health benefits for its employees. Additional accident and sickness benefits had been suggested by the Union's team during negotiations. The company rejected all suggestions that they provide any additional benefits. As of October 14, 1988, the only benefits the company had agreed to provide were those which they already provided.

**16.** At least one employee had inquired whether the existing benefits were going to continue. This inquiry was part of the reason why Mr. Jenkins wanted an explicit reference to the health benefits. *See,* Tr. at 306.