# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 03-3699

NATIONAL LABOR RELATIONS BOARD,

*Petitioner*,

v.

GENERAL TEAMSTERS UNION LOCAL 662,

*Respondent.*

———————

Application for Enforcement of an Order
of the National Labor Relations Board.
No. 18-CB-4111

———————

ARGUED APRIL 15, 2004—DECIDED MAY 13, 2004

———————

Before FLAUM, *Chief Judge*, and MANION and ROVNER,
*Circuit Judges*.

FLAUM, *Chief Judge*. In 2003, the National Labor Rela-
tions Board ("NLRB") concluded that the General Team-
sters Union Local 662 ("the Union") had violated Section
8(b)(3) of the National Labor Relations Act by refusing to
execute a contract it had negotiated with W.S. Darley &
Company ("the Company"). The NLRB then applied to this
Court for enforcement of its order. For the reasons stated
herein, we grant enforcement of the NLRB's order.

## I. BACKGROUND

The Union is the exclusive bargaining representative for all of the employees at the Company's Chippewa Falls manufacturing facility. In May 2000, the labor agreement between the Union and the Company expired and the parties began negotiating a new agreement. The parties soon reached an impasse, and the Union went on strike in August 2000.

During the strike, seven bargaining unit members crossed the picket line and returned to work. The future employment status of these employees, known as "crossovers," became yet another point of contention between the Company and the Union. The Company of course wanted these employees to be retained after the strike ended, but the Union disagreed. Negotiations on this and other issues continued on an irregular basis throughout the strike. At this point, some of the unit employees began complaining that the Union's four employee-representatives on the negotiating committee seemed more attentive to personal agendas rather than the interests of the group. The Company also had been having problems with these four representatives, and therefore expressed concern to the Union that these employees were detrimental to labor-management peace.

On the morning of October 3, 2000, the parties began a negotiation session to attempt to end the strike. The Union was represented by its international vice president and its secretary-treasurer. The four employee-representatives were also available nearby in the Union's caucus room. In turn, the Company was represented by its attorney. Both the Union and the Company knew that the Union's constitution required that any agreement made by the parties be ratified by a majority vote of the bargaining unit employees.

At the onset of this negotiation session the parties resolved several issues. However, there remained two points

of disagreement. First, the parties disagreed about what to do with the crossover employees. During the strike the Company had subcontracted work out. As a result, there was insufficient work for more than four employees in the division where four of the crossovers were currently working. The Union insisted that four strikers who had more seniority than the crossovers be given the positions, but the Company did not want to lay off the crossovers to make room for strikers. Additionally, the parties disagreed about how to deal with the four employee-representatives who the Company believed impaired relations with the Union. In order to reach a final agreement, the Company proposed a quid pro quo under which the Company would find work for all eight employees (both the four crossovers and the four strikers), and in return the four employee-representatives would agree to resign their Union positions and not seek Union positions for the duration of their tenure with the Company.

When first presented with this proposal, the Union was hesitant to accept an agreement that required their employee-representatives to waive their rights to hold Union positions. The Union subsequently spoke to the employee-representatives who agreed to consider the proposal if it was put in writing. The Company added the quid pro quo to the contract that the parties had been drafting. The relevant provisions stated:

> 3. The union bargaining committee agrees to resign their committee positions and agrees further not to run for or hold any union bargaining unit position during the remainder of their employment at the W.S. Darley & Co. The committee will sign individual waivers confirming this agreement.

> 4. The company will recall four (4) additional employees in consideration for the agreement outlined in paragraph 3 above.

The Union took this proposal back to the employee-representatives and informed them that their agreement should be voluntary and that it was exclusively for the purpose of keeping four co-workers employed who would otherwise be laid off. The four employees agreed to the proposal and stated that they could live with it.

After the employee-representatives agreed, the Union told the Company that it accepted the offer and would present the offer for ratification by the Union members. The Union informed the Company that it would not make a recommendation that the employees either accept or reject the contract. The representatives of the Union and Company shook hands and announced to the media that a tentative agreement had been reached.

The ratification vote was subsequently scheduled for 5:00 p.m. on October 4, 2000. However, between the end of bargaining and the ratification meeting, two of the employee-representatives decided that they no longer wanted to resign their Union positions. The Union therefore decided that the membership should not vote on the quid pro quo provisions. When the contract was handed out to employees it included the quid pro quo provisions, but the Union instructed employees that they would not be voting on those issues. The employees then ratified the contract by a vote of 37-31.

The following Monday, October 9, the strikers returned to work. Included in this group were the four strikers whose employment was provided for in the quid pro quo provisions of the contract. That same day, the Company called the Union to find out why one of the employee-representatives who should have resigned was signing Union grievances. At this point, the Union informed the Company that the Union did not submit the quid pro quo provisions to the employees for ratification. The Company protested that the Union could not amend the contract by ratifying what it wanted

and rejecting what it did not want. The Company insisted that the parties had an agreement that included the quid pro quo provisions.

The Union subsequently sent several letters to the Company referring to the contract between the parties as valid. None of these letters mentioned that the quid pro quo provisions had been removed from the contract, nor did the letters indicate that the employees' ratification was incomplete or ineffective. On January 8, 2001, the Company sent a copy of the contract including the quid pro quo provisions to the Union for execution. The Union never signed it.

On April 2, 2001, the Company filed an unfair labor practice charge with the NLRB, alleging that the Union violated the National Labor Relations Act by refusing to execute the parties' contract. The Administrative Law Judge ("ALJ") agreed that the Union had violated Section 8(b)(3) of the National Labor Relations Act, and the NLRB affirmed the ALJ's rulings, findings, and conclusions. The NLRB now asks this Court to enforce its order.

## II. DISCUSSION

In reviewing an order of the NLRB, this Court gives substantial deference to both the NLRB's findings of fact and conclusions of law. *See Lincoln Park Zoological Soc'y v. NLRB*, 116 F.3d 216, 218 (7th Cir. 1997). The NLRB's factual findings must be upheld as long as they are supported by substantial evidence on the record as a whole. *See id.* The NLRB's legal conclusions will be upheld unless they are irrational or inconsistent with the National Labor Relations Act. *See id.* It is undisputed that Section 8(d) of the National Labor Relations Act requires parties to execute contracts that incorporate agreements reached by the parties. *See NLRB v. Local 554, Graphic Communications Int'l Union*, 991 F.2d 1302, 1305-06 (7th Cir. 1993).

Whether the parties have reached an agreement is a factual question to be decided by the NLRB. *See NLRB v. Burkart Foam, Inc.*, 848 F.2d 825, 829 (7th Cir. 1988).

In this case, the NLRB found that an agreement between the Company and the Union was reached when the representatives of each group shook hands after agreeing on the quid pro quo provisions. However, the Union argues that such an agreement does not rise to the level of a binding contract because: (1) employee ratification was a condition precedent to contract formation; (2) without ratification there was no meeting of the minds; and (3) the employee-representatives' written waivers constituted a condition precedent to contract formation.

We begin with the Union's arguments that ratification was a condition precedent to contract formation and that without ratification there could be no meeting of the minds. At the outset, the Union must prove that the parties agreed that ratification was necessary to contract formation. *See NLRB v. Roll & Hold Div. Area Transp. Co., Inc.*, 957 F.2d 328, 331 (7th Cir. 1992); *see also NLRB v. Truckdrivers, Chauffeurs & Helpers, Local Union No. 100*, 532 F.2d 569 (6th Cir. 1976). As this Court has previously held, the fact that a union has bylaws that require all agreements to be ratified does not automatically result in a condition precedent to contract formation. *See Roll & Hold*, 957 F.2d at 331. Neither does the fact that the company negotiating with the union knows that the bylaws require ratification. *See id.* Therefore we seriously doubt, as did the NLRB, that the Union could establish that a condition precedent existed in this case. At most, the Union can show that it advised the Company that there would be a ratification meeting. The Union does not provide any credible evidence to show that the Union representatives informed the Company that they lacked authority to bind the Union.

But even if the Union could prove that such a condition precedent existed, it would still not prevail. It is a well-known precept of contract law that when the occurrence of a condition precedent is totally within the control of one of the parties, that party has a duty to act in good faith and with reasonable efforts to bring about its occurrence. *See, e.g.*, *E.B. Harper & Co., Inc. v. Nortek, Inc.*, 104 F.3d 913, 919 (7th Cir. 1997). Here, as soon as the Union accepted the Company's proposal (which included the quid pro quo provisions), it informed the Company that a ratification vote would be scheduled and that the Union would not make a recommendation as to whether the employees should accept or reject the contract. What the Union actually did, however, was schedule a ratification vote and then instruct the employees that they could not vote on the quid pro quo provisions. Now the Union attempts to avoid the contract on the basis of improper ratification of the quid pro quo provisions. This Court will not sanction such unfair and dilatory tactics. *See NLRB v. Local 554, Graphic Communications Int'l Union*, 991 F.2d 1302, 1307 (7th Cir. 1993) (holding that where a contract between an employer and a union is conditioned upon the union obtaining approval from its international headquarters, the union cannot avoid the contract by failing to submit the contract to its international headquarters). There was a meeting of the minds when the parties shook hands agreeing to the contract terms and the Union promised it would have a ratification vote on those terms. The fact that the Union later broke its promise does not invalidate the original agreement.

Moreover, the Union may be bound to the agreement under an estoppel theory. *See id.* After the Company informed the Union that it could not pick and choose contract terms and the Company asserted that the parties had an agreement including the quid pro quo provisions, the Union sent multiple letters confirming ratification and requesting

that the Company provide it with a copy of the contract. The strike ended, as planned, and the Company employed the four workers provided for under the quid pro quo provisions. The Company did not know that the Union had changed its mind about the quid pro quo provisions until it discovered the employee-representatives still acting on behalf of the Union. In sum, the Union acted consistently with a theory of total ratification and accepted the benefit of the quid pro quo provisions but now argues that ratification of those provisions never occurred. These factors, added to those already discussed, provide substantial evidence supporting the NLRB's conclusion that a valid agreement was reached in spite of the lack of employee ratification.

Similarly, we are not persuaded by the Union's arguments that the employee-representatives' written waivers were a condition precedent to contract formation. The quid pro quo provisions stated that the "committee will sign individual waivers confirming this agreement." This indicates that the agreement had already been reached and that the signatures were a mere formality. This does not indicate that the written waivers were a necessary condition before an agreement could be reached. Under the law, all that is required for an employee to waive the right to hold union office is a clear and unmistakable statement of intent to waive this right. *Cf. Metropolitan Edison Co. v. NLRB*, 460 U.S. 693, 707-08 (1983). Moreover, a union may waive its members' rights. *See id.* at 706-07; *Merillat Indus., Inc.*, 252 N.L.R.B. 784, 786 (1980). Considering the plain language of the contract, as well as the fact that the employee-representatives clearly and unequivocally orally waived their rights and agreed to the contract provisions, there was substantial evidence supporting the NLRB's conclusion that written waivers were not a condition precedent to contract formation.

Even if the NLRB correctly determined that a contract existed between the parties, the Union argues that the quid

pro quo provisions contained an illegal bargaining subject and therefore the Union was not required to execute the contract. Subjects of collective bargaining contracts fall into one of three categories—they may be either mandatory, permissive, or illegal. *See Hill-Rom Co. v. NLRB*, 957 F.2d 454, 457 (7th Cir. 1992). Mandatory subjects may be unilaterally determined by the employer, permissive subjects may not be implemented unilaterally, and illegal subjects are those that may not be included in a contract at all. *See id.*; *see also Eddy Potash, Inc.*, 331 N.L.R.B. 552, 559 (2000). The first problem with the Union's argument is that it was made for the first time to the NLRB. As we have previously held, a party waives the right to appeal an issue to the NLRB if it did not raise the issue below. *See, e.g.*, *Barton Brands, Ltd. v. NLRB*, 529 F.2d 793, 801 (7th Cir. 1976). The Union argued before the ALJ that the quid pro quo provisions contained a permissive subject of bargaining. Thus, the NLRB properly refused to consider the Union's new argument that the quid pro quo provisions were an illegal subject of bargaining. In any event, the Union's argument should not have prevailed because an employee's waiver of his right to hold union office is a permissive subject of bargaining and not an illegal one. *See Southwestern Portland Cement Co.*, 289 N.L.R.B. 1264, 1280 (1988) (stating that who can be on the union grievance committee is a permissive subject of bargaining); *Merillat Indus., Inc.*, 252 N.L.R.B. 784, 786 (1980) (stating that "a union may contract away its freedom to choose its representatives by specifying, in a collective-bargaining agreement, who they are to be").

Finally, the Union argues that the NLRB's decision exceeds the scope of the NLRB's authority because it impermissibly intrudes into the Union's internal affairs. We conclude that this issue was not internal because it involved the Union's relationship with the Company. *See Service Employees Local 254*, 332 N.L.R.B. 1118, 1125 n.20 (2000).

Cases involving the formation or validity of a union agreement are well within the NLRB's authority, even when they also involve a union's discipline of its members. *See Pattern Makers' League of North America v. NLRB*, 473 U.S. 95, 100 (1985); *Bethenergy Mines*, 308 N.L.R.B. 1242, 1244-45 (1992). The Union's argument to the contrary is therefore without merit.

### III.  CONCLUSION

Substantial evidence supports the NLRB's finding that the Union violated the National Labor Relations Act when it refused to execute the agreement it had reached with the Company. Therefore, we ENFORCE the NLRB's order in full.

A true Copy:

      Teste:

                    _____
                    *Clerk of the United States Court of*
                        *Appeals for the Seventh Circuit*