NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0046n.06

Case Nos. 22-1079/1111

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Jan 20, 2023
DEBORAH S. HUNT, Clerk

THE PAINTING CONTRACTOR, LLC,

    Petitioner /Cross-Respondent,

v.

NATIONAL LABOR RELATIONS BOARD,

    Respondent /Cross-Petitioner.

)
)
)
)
)
)
)
)
)
)
)

ON PETITION FOR REVIEW
AND CROSS APPLICATION
FOR ENFORCEMENT OF AN
ORDER OF THE NATIONAL
LABOR RELATIONS BOARD

OPINION

Before:  BATCHELDER, BUSH, and DAVIS, Circuit Judges.

**DAVIS, Circuit Judge.**  The Painting Contractor, LLC ("TPC") petitions for review of an Order of the National Labor Relations Board (the "Board") finding that TPC violated the National Labor Relations Act ("NLRA" or the "Act").  The Board cross-petitions for enforcement of its Order.  The proceedings below centered on TPC's allegedly unlawful refusal to adhere to a collective bargaining agreement ("CBA") which was negotiated to tentative agreement on May 28, 2019 and which it executed on June 5, 2019.  For the reasons set forth below, the court AFFIRMS in part and VACATES in part the Board's final Order, and REMANDS for further proceedings.

**I.**

TPC is a commercial and industrial painting contractor in the Greater Cincinnati area. Between 2016 and 2019, TPC was party to a multiemployer bargaining unit represented by the Greater Cincinnati Painting Contractors Association ("the Association").  It is undisputed that TPC

was a member of the Association, but the parties now dispute whether TPC validly withdrew from the Association before a new CBA was reached in mid-2019.

The Board issued an Order finding that TPC violated the NLRA by failing to adhere to the terms of a CBA reached by the Union and the Association on May 28, 2019. The Union represents painters and drywall finishers in and around Cincinnati, previously including employees of TPC. Union membership is composed of employees of companies that are members of the Association. The Union intervened in this appeal.

This dispute concerns TPC's attempt to withdraw from the Association and negotiate with the Union independently. The Board's precedents make clear that unions and employers alike must adhere to strict procedural requirements to lawfully exit multiemployer bargaining arrangements. *Retail Assocs., Inc.*, 120 NLRB 388, 393 (1958) (stating that the right of withdrawal is not "free and uninhibited"). Specifically, a party's withdrawal from multiemployer bargaining is effective only if it is timely and unequivocal. *Id.* (explaining that the timeliness requirement is met where withdrawal occurs prior to the date set by the CBA for modification or before the date on which negotiations are set to commence). Moreover, the Board generally does not permit withdrawal once bargaining negotiations have commenced absent mutual consent or "unusual circumstances."[1] *Id.* at 395. These procedural requirements reflect the Act's core policy purpose, which is to "foster and maintain stability in bargaining relationships." *Midland Elec. Contracting Corp. & United Elec. Workers of Am., IUJAT, Loc. 363*, 365 NLRB No. 87, 2016-17 NLRB Dec. P 16321 (June 6, 2017) (citing *Retail Assocs.*, 120 NLRB at 393), *enforced*, 774 F. App'x 85 (3d Cir. 2019).

---

[1] The Board's underlying Order did not squarely address the existence of such mutual consent or unusual circumstances, so these considerations are not at issue on appeal.

**II.**

The Association and the Union were parties to a CBA effective from May 1, 2016 to May 1, 2019 (the "Old CBA"). Among other things, the Old CBA provided a mechanism for member contractors to withdraw from the Association and then independently negotiate with the Union after doing so. That provision, Article 19 of the Old CBA, reads as follows:

> Any contractor that decides to withdraw from [the Association] and negotiate [with the Union] separately, may only do so at the expiration of this Agreement, provided such contractor provides . . . *written notice to the Union and the Association at least 3 days before any extension of this Agreement* is executed by the Association.

(Emphasis added). The Old CBA also included a no-strike provision codified under Article 18. The no-strike clause provided that "[n]either the Union nor any employee shall take part in, cause, or aid any strikes[,] slowdown, picketing, or other impeding or interference with the operations of the Employer during the terms of this Agreement." The Union's lead negotiator testified below that "based on this no strike clause, [union members] could not be on strike while [the Old CBA] was in effect."

The Union and the Association bargained for a successor to the Old CBA, or the "New CBA," from February 11, 2019 through May 28, 2019. During the negotiations, the Association and the Union reached three successive "proposed tentative agreements," which were then submitted to the Union's rank-and-file members for their approval (or "ratification"). With each tentative agreement, the parties also expressly agreed to extend—and thus continue to be bound by—the Old CBA pending the Union members' approval of a New CBA. Union members rejected the first two proposals before ultimately ratifying the third proposal. Below are pertinent details concerning each proposed agreement as well as TPC's actions to withdraw from the multiemployer bargaining agreement in the midst of the negotiations.

*The First Tentative Agreement ("TA1")*

The Union and the Association reached TA1 on or about April 23, 2019. TA1 states that it is a "proposed Tentative Agreement *for Ratification*." (Emphasis added). The Union and the Association agreed to extend the Old CBA – and thus to remain bound by its terms – through May 14, 2019, pending ratification by members of the bargaining unit (the "First Extension Agreement"). Union members rejected TA1 on or about May 7, 2019. The Union informed the Association that "membership rejected TA1" and sought to continue negotiations for "a new tentative agreement that Union membership would ratify."

*The Second Tentative Agreement ("TA2")*

After the Union members rejected TA1, the parties met on May 13, 2019 to continue bargaining for a new proposed agreement. The negotiations failed on that date. During the administrative hearing, a Union leader testified that the Union "ended up figuring we were going to go on strike on the 14th" – upon expiration of the Old CBA – because of the parties' inability to agree on a proposal. The parties averted a strike, however, when they successfully crafted TA2 on May 14, 2019. The Union agreed to "take this proposal . . . to the members for a ratification vote" on that same date and canceled the strike.

Like TA1, TA2 stated in large letters that it was a "proposed Tentative Agreement *for Ratification*." (Emphasis added). The parties also formally agreed to extend the Old CBA through May 23, 2019 (the "Second Extension Agreement") specifically "to allow the Union's members to vote" on TA2. The Second Extension Agreement set forth the following:

> The [Association and the Union] are currently bound by a [CBA] . . . effective through April 30, 2019.

> The parties believe that it would be mutually beneficial for the agreement to remain effective through . . . May 23, 2019.

Therefore, the parties agree that *the current [CBA] shall be extended and shall remain in effect until . . . May 23, 2019.*

*In the event the Union ratifies a new [CBA]* prior to the expiration of this Contract Extension Agreement, the Association agrees that all economic improvements . . . negotiated in the new [CBA] shall be paid retroactive[ly to May 1, 2019], and the retroactive improvements must be paid to the employees *no later than two weeks after the Union ratifies said new [CBA].*

(Emphasis added). Hence, under the Second Extension Agreement, the Union and the Association agreed to remain bound by the Old CBA until May 23, 2019 – *unless* the members of the Union ratified a new CBA before then.

*TPC's Article 19 Notice of Withdrawal*

On May 17, 2019, TPC informed the Union and the Association that it intended to invoke its rights under Article 19 of the Old CBA – which authorized withdrawal from the multiemployer bargaining unit under limited circumstances. TPC's notice of withdrawal stated:

Pursuant to Article [19] of the [Old CBA], if there is a further extension of the [Old CBA], then this is TPC's notice of withdrawal from the Association, *contemporaneous with such extension*. TPC would thereafter negotiate separately with the Union on its own behalf for a new agreement to be effective after the extension expires.

(Emphasis added). Again, Article 19 required such notice at least three days before the Association executed "any extension" of the Old CBA.

*Rejection of TA2*

Six days after TPC's notice, Union members voted down TA2 on May 23, 2019, at which point the Old CBA expired. On May 24, 2019, the Union informed the Association that the bargaining unit rejected TA2 and requested "to continue negotiation *so we can present a CBA that*

5

*can be ratified."* (Emphasis added). In the meantime, members of the Union went on strike as of May 24, 2019 following the lapse of the Old CBA.[2]

*The Third Tentative Agreement ("TA3")*

With the strike ongoing, the Union and the Association returned to the bargaining table on May 28, 2019 and ultimately agreed to TA3 which was "subject to ratification by the members." Like TA1 and TA2, TA3 contained a notation at the beginning indicating it was a "proposed Tentative Agreement *for Ratification*." (Emphasis added).

Critically, the Union and the Association also agreed to extend the Old CBA,[3] this time through June 5, 2019 (the "Third Extension Agreement"). The Third Extension Agreement was identical to the Second Extension Agreement except for its expiration date of June 5. Just like the Second Extension Agreement, the Third Extension Agreement also included provisions contemplating the possibility that the Union might ratify a new CBA before June 5. Once the Union informed its members of these events, they ended the strike.

*TPC's Announcement of Withdrawal from the Association*

On May 28, 2019, TPC notified the Union and the Association that, by operation of its May 17th Article 19 notice of withdrawal, the Association would no longer represent TPC in negotiations with the Union. TPC maintained that "no agreement reached between the Association and Union that would be effective after expiration of the current extension [of the Old CBA] will apply to TPC." TPC also asked the Union to meet for a bargaining session on May 30, 2019. The Union responded on May 29 by disputing TPC's claim that it was not bound to TA3. But on May 30, TPC reiterated its position that it was *not* bound to TA3 because it withdrew from the Association "contemporaneous" with the May 28 extension of the Old CBA. TPC insisted that

---

[2] Article 18 of the Old CBA – which was, prior to this point, still legally binding on the Union and the Association – prohibited strikes. Promptly after the expiration of the Old CBA, Union members went on strike.
[3] This extension of the Old CBA occurred eleven days after TPC filed its Article 19 notice of withdrawal on May 17.

"on May 28, 2019, by operation of Article [19] and TPC's Article [19] notice, TPC separated from the Association, and is not bound by any alleged Tentative Agreement or any other agreements between the Association and the Union that would be in effect after June 5." TPC also forwarded the Union a proposed CBA of its own, which the Union refused to consider.

*TA3 is Ratified*

Members of the Union ultimately voted to ratify TA3 on June 5, 2019 and the resultant agreement became the New CBA. The wage and benefit terms of the New CBA retroactively applied from May 1, 2019 through May 1, 2021.

*Summary of Key Events*

The table below summarizes key events in the Union and the Association's bargaining process, including TPC's attempt to withdraw from the Association.

| Date | Event |
|---|---|
| **April 23, 2019** | The Union and the Association negotiate TA1 and agree to extend the Old CBA to May 14. |
| **May 7, 2019** | Union members vote to reject TA1. |
| **May 14, 2019** | The Union and the Association negotiate TA2 and agree to extend the Old CBA to May 23. |
| **May 17, 2019** | TPC files notice of withdrawal pursuant to Article 19 of the Old CBA. |
| **May 23, 2019** | Union members vote to reject TA2. Old CBA expires. |
| **May 24, 2019** | Union members go on strike. |
| **May 28, 2019** | The Union and the Association negotiate TA3 and agree to extend the Old CBA to June 5. Union members end the strike. TPC maintains it shall not be bound by any future agreement between the Union and the Association by operation of Article 19. |
| **June 5, 2019** | Union votes to ratify TA3. |

**III.**

This court applies the substantial-evidence standard to the factual determinations of the Board. Thus, the Board's factual findings are conclusive if they are supported by "substantial evidence on the record considered as a whole." 29 U.S.C. § 160(f); *NLRB v. Loc. 334, Laborers Int'l Union of N. Am.*, 481 F.3d 875, 878–79 (6th Cir. 2007); *NLRB v. Gen. Fabrications Corp.*, 222 F.3d 218, 225 (6th Cir. 2000). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and the court "may [not] displace the Board's choice between two fairly conflicting views." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 488 (1951) (internal quotation marks omitted); *see also, e.g.*, *FirstEnergy Generation, LLC v. NLRB*, 929 F.3d 321, 328–29 (6th Cir. 2019) (explaining same); *cf. Keeler Corp. v. NLRB*, 719 F.2d 847, 850 (6th Cir. 1983) (explaining that substantial evidence entails "more than a mere scintilla but less than a preponderance") (internal quotation marks omitted). Hence, we afford great deference to the Board's findings of fact.

Even so, substantial evidence review also includes consideration of evidence in the record that differs from to the Board's findings. *Universal Camera*, 340 U.S. at 488 ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight."); *NLRB v. Seawin, Inc.*, 248 F.3d 551, 555 (6th Cir. 2001); *DTR Indus., Inc. v. NLRB*, 39 F.3d 106, 110 (6th Cir. 1994); *see also Dish Network Corp. v. NLRB*, 953 F.3d 370, 377 (5th Cir. 2020) ("After all, we must review the Board's decisions 'on the record considered *as a whole*.'") (emphasis in original) (quoting 29 U.S.C. § 160(f)). Courts in our sister circuits have vacated – and at times reversed – the Board during substantial evidence review where the Board ignored or inadequately addressed evidence running against its conclusion. *See, e.g.*, *Dish Network Corp.*, 953 F.3d at 377 (explaining that to satisfy the substantial evidence standard, the Board should "grapple with" facts countervailing those that it relied on to reach its conclusion); *STP Nuclear Operating Co. v. NLRB*,

975 F.3d 507, 520–21 (5th Cir. 2020) (finding an absence of substantial evidence supporting the Board's conclusion where, for example, the Board "failed to discuss or at best perfunctorily mentioned" negative facts in the record); *Good Samaritan Med. Ctr. v. NLRB*, 858 F.3d 617, 621 (1st Cir. 2017) (finding the Board's conclusion lacked "substantial evidence <u>on the record as a whole</u>" due to "considerable contradictory evidence in the record that the NLRB failed to consider") (emphasis in original); *Entergy Miss., Inc. v. NLRB*, 810 F.3d 287, 298 (5th Cir. 2015) (finding that because the Board ignored relevant facts in the record in its reasoning, the Board's decision could not survive substantial evidence review; vacating in part and remanding for further proceedings on the relevant issue); *Lakeland Health Care Assocs., LLC v. NLRB*, 696 F.3d 1332, 1335 (11th Cir. 2012) (explaining that the Board "cannot ignore relevant evidence detracting from its findings" and that when it does so, "its conclusions are less likely to rest upon substantial evidence"). Finally, the court must "carefully scrutinize accusations that the Board failed to abide by [its] precedent," as such departures must be "explicitly and rationally justified." *Kellogg Co. v. NLRB*, 840 F.3d 322, 327 (6th Cir. 2016) (quoting *Kindred Nursing Ctrs. v. NLRB*, 727 F.3d 552, 560 (6th Cir. 2013)) (citing *Vokas Provision Co. v. NLRB*, 796 F.2d 864, 869 (6th Cir. 1986)).

## A.    Enforcement of Uncontested Portions of the Board's Order

TPC did not challenge the Board's decision that TPC violated Sections 8(a)(5) and (1) of the Act by unilaterally changing the amount of its contributions to employee benefit funds in June 2019. As a result, TPC has "effectively admitted the truth of those findings." *Gen. Fabrications Corp.*, 222 F.3d at 231–32 (quoting *NLRB v. Ky. May Coal Co.*, 89 F.3d 1235, 1241 (6th Cir. 1996)) (explaining that employer waived arguments against certain Board findings by neglecting to contest them on appeal). With respect to these uncontested violations, the Board's Order is entitled to summary affirmance. *Id.*; *see also Vanguard Fire & Supply Co., Inc. v. NLRB*, 468 F.3d 952, 956 (6th Cir. 2006) ("In cases in which the employer fails to challenge a portion of the

Board's findings on appeal, this court may 'summarily enforce the Board's order with regard to those issues.'"). The court therefore grants the Board's cross-application to enforce its final Decision and Order on this ground.

**B.      Effective Date of TPC's Withdrawal**

A threshold issue in this case is the effective date of TPC's withdrawal from the Association. For its part, TPC emphasizes that Article 19 of the Old CBA merely required notice of withdrawal at least three days before a contract extension. TPC filed its notice on May 17, 2019. Thus, in TPC's view, its notice took effect on May 21, once three full days had elapsed and no contract extension had occurred in that time; its notice of withdrawal came at least three days before the next extension of the Old CBA, which did not occur until May 28. If the court were to agree with this position, it would follow that TPC was not a member of the Association the following week when TA3 was negotiated and TA3 would have no legal force as to TPC and TPC could not be held liable for failing to adhere to its terms.

Contrarily, the Board found that TPC's withdrawal did not become effective until May 28, 2019, when the Union and the Association executed the Third Extension Agreement. For support of its finding, the Board cited the text of TPC's Article 19 notice – which plainly set forth that its withdrawal would be "contemporaneous with" any further extension of the Old CBA. TPC also stipulated that "withdrawal did not occur until the Association and the Union executed the third extension."[4] Accordingly, since TPC expressly linked its withdrawal to the contract extension executed on May 28, the Board held that it did not occur until that event.[5]

---

[4] TPC seemingly does not attempt to reconcile this stipulation with the argument that its withdrawal became effective on May 21.

[5] The Board's reasoning suggests that had TPC *not* timed its withdrawal to occur contemporaneously with a contract extension – and instead simply had given three days' notice prior to any future contract extension in the most general sense, and in keeping with Article 19 – it might have succeeded in its efforts.

The court will not disturb the Board's factual finding on this point because it was supported by substantial evidence – namely, the undisputed facts regarding TPC's notice and TPC's own admissions before the ALJ. *See, e.g.*, *Universal Camera Corp.*, 340 U.S. at 477–78.

**C.      Whether Ratification Was a Condition Precedent to Contract Formation**

Having determined that TPC's withdrawal coincided with execution of the Third Extension Agreement, the Board next found that the withdrawal never became effective because the Association entered into a new and binding agreement, TA3, immediately prior to that event.  TPC nevertheless argues that because it withdrew from the Association before the Union members ratified TA3, TA3 is not binding on TPC.  TPC contends that "basic principles of contract acceptance" called for ratification and the Third Extension Agreement "explicitly conditioned [TA3] on the Union membership's ratification."  The Board and the Union counter that ratification was not a condition precedent, so TA3 immediately became binding on TPC even without the membership's approval.

To succeed in its argument that there existed a condition precedent to contract formation, TPC ultimately must show that the Union and the Association *agreed* that ratification was necessary to contract formation.  *See NLRB v. Truckdrivers, Chauffeurs & Helpers, Loc. Union No. 100*, 532 F.2d 569, 570–71 (6th Cir. 1976); *NLRB v. Roll & Hold Div. Area Transp. Co., Inc.*, 957 F.2d 328, 331 (7th Cir. 1992).  As a general matter, it is well established that the NLRA does not require ratification as a condition precedent to executing a binding CBA.  *Cent. States Se. & Sw. Areas Pension Fund v. Kraftco*, 799 F.2d 1098, 1111 (6th Cir. 1986) ("There is no independent requirement in federal law of ratification [of a CBA] by a union."); *Gen. Teamsters Union Loc. 662*, 339 NLRB 893, 898 (2003); *see also Houchens Mkt. of Elizabethtown, Inc. v. NLRB*, 375 F.2d 208, 212 (6th Cir. 1967) ("[W]hether or not [the] bargaining unit may enter into a binding contract with or without membership ratification . . . . is not an issue which the Company can insist

11

upon without mutual agreement by the Union."). Instead, "when an agent is appointed to negotiate a [CBA], that agent is [generally] deemed to have apparent authority to bind his principle [sic] in the absence of clear notice to the contrary." *Gen. Teamsters Union Loc. 662*, 339 NLRB at 898 (quoting *Univ. of Bridgeport*, 229 NLRB 1074, 1074 (1977)). However, the fact that the law does not require ratification as a condition precedent does not preclude the existence of such a condition precedent under certain circumstances.

For ratification to become a condition precedent to executing a CBA, the negotiating parties must agree to that requirement. *E.g.*, *Gen. Teamsters Union Loc. 662*, 339 NLRB at 898; *see also Teamsters Loc. 287 (Granite Rock Co.)*, 347 NLRB No. 32, 2006-07 NLRB Dec. P 17142 (May 31, 2006), *enforced*, 293 F. App'x 518 (9th Cir. 2008); *Hertz Corp.*, 304 NLRB 469, 469 (1991); *Beatrice/Hunt-Wesson*, 302 NLRB 224, 224 n.1 (1991). Such an agreement can be evidenced by the express terms of the operative CBA. *See, e.g.*, *Beatrice/Hunt-Wesson*, 302 NLRB at 224 n.1, 226. But even absent such express terms, other relevant considerations such as the parties' bargaining history and relevant course of conduct may establish that ratification is a condition precedent. *See id.* (explaining that labor contracts may be interpreted by way of "the negotiations and established practices that comprise the bargaining history"); *Williamhouse-Regency of Del.*, 297 NLRB 199, 203 (1989), *enforced*, 915 F.2d 631 (11th Cir. 1990) (examining negotiating parties' past practices to determine whether an offer was conditioned upon ratification); *Cherokee United Super*, 250 NLRB 29, 32 (1980) ("The bargaining history and all other relevant circumstances surrounding the negotiations must be examined to determine if an enforceable agreement has been reached.").

The Board concluded that ratification by the unit members was *not* a condition precedent to contract formation in this case based on its findings that ratification was neither an express term of TA3, nor a condition explicitly agreed to by the Union and the Association. Instead, it found

that ratification was merely required by the Union's constitution[6] – rendering it a procedural technicality operating on the Union alone. The Board cited *Williamhouse*, 297 NLRB 199 (1989), for the proposition that ratification is not a condition precedent simply because a union constitution internally requires it, namely where the negotiating parties never expressly contract around a ratification requirement. It further explained that, in keeping with Board precedent, the Union's constitution ratification provision "signifie[d] only that rights and duties under any agreement reached would not become effective until ratified by the employees." It made no difference that the agreement reached on May 28, 2019 was called a "tentative agreement." TA3 was binding on the Association's members (TPC included) the moment the parties shook hands on it.

Yet the record contains several facts that would seem to detract from the Board's conclusion that ratification was not a condition precedent. And the Board rather conspicuously failed to address these portions of the record.

First**,** the record demonstrates a repeated pattern of dealing in which (a) the Union and the Association would reach a tentative agreement; (b) the Union would put the agreement to a vote by its members; and (c) the tentative agreement would rise or fall based on the Union members' ratification vote. Indeed, the Union members rejected the parties' first two tentative agreements, causing the parties to go back to the drawing board. And the Association at no time attempted to

---

[6] The Union's constitution provides that "[a]ll [CBAs] . . . shall be subject to ratification through a referendum vote of the members working under the [CBA]." However, even where a union's constitution or by-laws contain a provision requiring ratification of labor agreements, this does not create a condition precedent for contract formation under the Act. *E.g.*, *Observer-Dispatch*, 334 NLRB 1067, 1072 (2001) ("In cases in which a union has self-imposed an internal ratification requirement, the Board has long held that an employer must sign the agreement upon request, regardless of whether or not ratification has taken place."); *Gen. Teamsters Union Loc. 662*, 339 NLRB at 898; *Williamhouse*, 297 NLRB at 199 n.5 ("When a union, as here, limits its own authority to enter into a binding agreement with an employer by imposing on itself the requirement that its membership ratify the agreement, that requirement does not constitute a condition precedent."). The Board treats such provisions as gratuitous, self-imposed limitations on the union alone – "signif[ying] only that rights and duties under any agreement reached would not become effective until ratified by the employees." *Gen. Teamsters Union Loc. 662*, 339 NLRB at 898–99; *Tri-Produce Co.*, 300 NLRB 974, 974 n.2 (1990); *Sacramento Union*, 296 NLRB 477 (1989).

claim the benefit of its bargain by refusing to continue negotiations or, as another example, by standing on the wage and pension terms that the Union had previously agreed to and were binding on the parties under the Board's Order. Instead, the parties simply resumed negotiations each time the Union members rejected a tentative agreement. Eventually, the membership was satisfied by the terms of TA3 and voted to ratify it, thereby ending the bargaining process. These facts suggest that the ratification requirement had greater legal significance than the Board accorded it – or at least deserved careful consideration in the Board's Order.

Second, after the Union members rejected both TA1 and TA2, the Union emailed the Association seeking to continue negotiations on "a proposal that could be ratified." And, consistent with this stated intent, each agreement reached by the Union and the Association was labeled "*proposed [t]entative [a]greement for [r]atification*." (Emphasis added). Further, the parties jointly stipulated that on May 28, the Union and the Association "agreed to [TA3] . . . *subject to ratification* by the members." (Emphasis added). There are two points of note here. First, it seems facially incongruent to call a purportedly legally binding contract a mere "proposal" for third party review if the third party had no true say in the agreement. Second, the Union and the Association's negotiations were explicitly geared toward the goal of crafting tentative agreements "that could be ratified" by Union members rather than a goal of executing an agreement that they themselves—as adverse parties zealously bargaining for their respective members—were willing to accept. Stated another way, the Union repeatedly told the Association that a binding agreement would not be executed until the bargaining unit voted to ratify it. These facts suggest that the parties saw ratification not as a gratuitous consideration applicable to the Union alone, but one that stood between them and a final agreement.

Third, both the Old CBA and the New CBA contained a no-strike clause in Article 18. The no-strike clause apparently carried over through each tentative agreement, such that it was

incorporated into TA2, for example. Yet, when Union members rejected TA2 on May 23 (at which point the Old CBA expired under the Second Extension Agreement), they lawfully went on strike effective May 24, 2019.[7] In other words, when the membership was dissatisfied with TA2, they were not beholden to TA2's no-strike mandate – which would have been effective had TA2 become the operative CBA.[8] This, too, at least intimates that ratification was a condition precedent to contract formation.

Fourth, the Union and the Association executed three agreements to extend the Old CBA for set periods of time. In practice, these extensions gave the Union time to present each tentative agreement to its membership for approval. For example, the parties jointly stipulate that on May 28, "[t]he Union and [the] Association also agreed to extend the Old CBA . . . to allow the membership to . . . return to work until [TA3] could be voted on." TPC questions why the negotiating parties thought to extend the Old CBA if their tentative agreements truly were binding on all parties prior to ratification. Its point is well taken; the very need for the extensions would seem to cast doubt on whether the tentative agreements themselves were legally binding. Yet the Board did not analyze this point in the underlying Order.

Even though the Board's findings are conclusive "if supported by substantial evidence on the record considered as a whole," the question here is whether substantial evidence supported the Board's finding that ratification was not a condition precedent to make TA3 a final and legally binding contract on TPC. *Cf. Nat'l Roof Sys., Inc. v. NLRB*, 983 F.2d 1068 (6th Cir. 1993) (unpublished table decision) ("The existence of an agreement is a question of fact for the Board to determine.") (citing *NLRB v. Int'l Credit Serv.*, 651 F.2d 1172, 1173 (6th Cir. 1981)). The parties'

---

[7] Another strike was scheduled for around May 14, 2019 following the Union members' rejection of TA1. The strike was avoided because the parties timely agreed to TA2 and executed the Second Extension Agreement.

[8] In fact, both TPC and the Board acknowledged at oral argument that there was *no* operative CBA during the strike.

bargaining history and surrounding conduct are relevant considerations in determining whether ratification was a condition precedent here. *E.g.*, *Williamhouse*, 297 NLRB at 203. And left unaddressed by the Board is record evidence supporting the proposition that the parties impliedly agreed to precondition the New CBA on employee ratification. The Board's failure to grapple with material facts that contradict its conclusion raises doubt that its decision rested upon substantial evidence. *E.g.*, *Dish Network Corp.*, 953 F.3d at 377; *Good Samaritan Med. Ctr.*, 858 F.3d at 621. As such, we remand this case to the Board for limited additional factfinding on this narrow point.

Finally, TPC's remaining argument that the Third Extension Agreement "explicitly conditioned [TA3] on the Union membership's ratification" is unpersuasive. An express, written agreement would be dispositive on the issue now before the court. But no fair reading of the Third Extension Agreement supports this conclusion. In relevant part, the agreement states as follows:

> In the event the Union ratifies a [New CBA] prior to the expiration of this Contract Extension Agreement [on June 5, 2019], the Association agrees that all economic improvements . . . negotiated in the [New CBA] shall be paid retroactive[ly] . . . as of May 1, 2019, and the retroactive improvements must be paid . . . no later than two weeks after the Union ratifies [the New CBA].

The plain text of this contract simply provides that if a New CBA is ratified by June 5, 2019, the terms of the New CBA will apply retroactively to May 1, 2019. It does not condition TA3 or the New CBA on ratification by the bargaining unit.[9]

## IV.

For the forgoing reasons we AFFIRM in part and VACATE in part the Board's final Order, and REMAND for further proceedings in accordance with this opinion.

---

[9] TPC additionally asks the court to find that it did not violate Section 8(a)(5) of the Act when it unilaterally imposed its own proposed labor contract on November 1, 2019, and that its contract proposal was not regressive. This issue is not ripe for review, because – as TPC and the Board correctly note – the answer to that question depends on whether TPC lawfully withdrew from the Association and thus was privileged to bargain independently with the Union.